# EXHIBIT B

LYONS & FLOOD, LLP
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400

Attorneys for Plaintiff
ONE-GO-EVENTS BENELUX BV

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

ONE-GO-EVENTS BENELUX BV,                           **ECF CASE**

                            Plaintiff,

          - against -                                07 Civ. 8185 (PKL)

JAM EXHIBITIONS, LLC,

                            Defendant.
---------------------------------------------------------------X

## FIRST AMENDED COMPLAINT AND JURY DEMAND

ONE-GO-EVENTS BENELUX BV ("One-Go-Events"), by its attorneys, Lyons & Flood, LLP, as and for its First Amended Complaint and Jury Demand against defendant, JAM EXHIBITIONS, LLC ("JAM"), alleges upon information and belief as follows:

1.      Plaintiff One-Go-Events is a foreign corporation organized and existing under the laws of The Netherlands, having its principal place of business at Singel 92, 3112 GS Schiedam, The Netherlands.

2.      One-Go-Events, is a promotion company with experience in the organization and logistical aspects of publicly accessible events, such as cultural exhibitions.

3.      Upon information and belief, JAM is a limited liability company organized under the laws of the State of Delaware, having a place of business at 207

West Goethe Street, Chicago, Illinois 60610.  Upon further information and belief, JAM

is a foreign corporation registered to conduct business in the State of New York.

     4.     Upon information and belief, JAM is a presenter and promoter of shows,

concerts, and other entertainment productions.

     5.     This Court has subject matter jurisdiction under 28 USC § 1332 in that

diversity of citizenship exists and the amount in controversy exceeds $75,000, exclusive

of interest and costs.

     6.     Upon information and belief, as part of a joint venture with an affiliate of

Concert Production International ("CPI"), JAM contracted with Premier Exhibitions, Inc.

("Premier"), the owner of the license to a human anatomy exhibition known as "Bodies

Exhibit," to present Bodies Exhibits throughout various cities internationally and Saint

Petersburg in particular.

     7.     Upon information and belief, under JAM's agreement with Premier, JAM

was required to pay Premier a $500,000.00 non-refundable fee for the license to, and

provision of, the specimens and other materials which comprised the Bodies Exhibit in

Saint Petersburg.  Additionally, Premier was to receive 50% of the net profits earned

from the Bodies Exhibit, up until net exhibition profit was equal to the aggregate of the

$500,000.00 license fee and certain other shared costs in launching the exhibition, at

which point Premier would receive 70% of the profits.

     8.     Upon information and belief, in exchange for its share of the net

exhibition profits, JAM was required to make all of the arrangements for the presentation

and promotion of the Bodies Exhibit.

     9.     Upon information and belief, JAM's practice was to engage a local

company as a partner in developing, presenting, and promoting the Bodies Exhibits in a particular region, with the local company sharing in both the expenses as well as JAM's profit split.

10.     JAM and One-Go-Events had discussions regarding One-Go-Events presenting and promoting the Bodies Exhibit in Saint Petersburg, Russia.

11.     On January 9, 2007, Paco Zimmer, President of JAM, contacted One-Go-Events to open negotiations regarding the possibility of One-Go-Events assisting JAM in presenting and promoting the Bodies Exhibit in Saint Petersburg, Russia.

12.     On January 12, 2007, One-Go-Events responded with a proposal outlining the services which One-Go-Events could offer to JAM.

13.     These preliminary discussions continued throughout January and February of 2007, as JAM began to develop its business plan for the venture.  This business plan was developed primarily by JAM but with input from One-Go-Events as to particulars specific to the market environment in Russia.

14.     On March 9, 2007, Mr. Zimmer provided One-Go-Events with a final copy of the business plan.  This was the only copy of the business plan which was ever exchanged and all the steps undertaken to present and promote the Bodies Exhibit in Saint Petersburg were taken based upon this business plan.  Under the business plan the Bodies Exhibit was scheduled to open on May 26, 2007, and to close on October 24, 2007.

15.     On March 25, 2007, Mr. Zimmer advised One-Go-Events that "BODIES The Exhibition is confirmed for St Petersburg, RU, Erasia for May 26 2007 opening through Oct 28 2007."

16.     On March 30, 2007, employees of One-Go-Events met with representatives of JAM at the Barbizon Hotel in Amsterdam to finalize negotiations for the Bodies Exhibit in Saint Petersburg and to finalize the marketing plans for the exhibition.

17.     At no time throughout these negotiations did JAM expressly reserve its right not to be bound without a formal written contract.

18.     On March 31, 2007, Mr. Zimmer sent One-Go-Events a draft Co-Promoter Agreement embodying all of the discussions which had taken place up to that point between JAM and One-Go-Events and commented "[w]e look forward to working with you on this exciting project."

19.     The draft Co-Promoter Agreement provided, among other things, that the Bodies Exhibit would open on May 26, 2007 and would close on October 24 – 28, 2007, and that One-Go-Events would pay $100,000.00 to JAM for presentment of the Saint Petersburg exhibition (one-fifth of the license fee owed to Premier by JAM), as well as assume one-fifth of all of the operating costs and cash required to start up the Saint Petersburg exhibition.  In exchange, One-Go-Events would be entitled to one-fifth of JAM's share of the profits related to the Bodies Exhibit.  The draft Co-Promoter Agreement made reference to a business plan and budget attached as Schedule A.  This was the business plan provided by JAM on March 9, 2007.

20.     Premier began to work with One-Go-Events directly in respect of technical matters immediately following the Amsterdam meeting.  Premier forwarded sample materials, and began discussions with One-Go-Events regarding how the exhibit hall should be decorated and renovated, providing architectural plans and drawings and

other instructions.  These design and marketing discussions would continue throughout April and May of 2007.

21.    Meanwhile, One-Go-Events entered negotiations with Ticketpro Montreal, Canada a Canadian ticket agency to handle ticketing for the Bodies Exhibit.  JAM was kept apprised regularly of One-Go-Events actions taken in preparation for the opening of the Bodies Exhibit.

22.    JAM and One-Go-Events agreed to revise the draft Co-Promoter Agreement to change the law and jurisdiction clause to provide that all disputes would be resolved by courts in The Netherlands courts applying the law of The Netherlands.

23.    This constituted the final agreement between JAM and One-Go-Events. (A copy of the final Co-Promoter Agreement (the "Final Agreement") is annexed hereto as Exhibit 1).  Schedule A in the Final Agreement refers to the business plan provided by JAM on March 9, 2007.  (A copy of the business plan is annexed hereto as Exhibit 2).

24.    Under the terms of the Final Agreement, the Saint Petersburg Exhibit was to open on May 26, 2007, and run until October 24, 2007.

25.    Under the terms of the Final Agreement, One-Go-Events was required to make a one-time payment of $100,000.00 to JAM, representing one-fifth (1/5) of the license fee JAM owed to Premier.

26.    Under the terms of the Final Agreement, One-Go-Events was required, among other things, to make all local arrangements (including obtaining any required rights, permits and licenses) for the presentation of the Saint Petersburg Exhibit, arrange for the installation requirements for the Saint Petersburg Exhibit to be completed, promote and advertise the Saint Petersburg Exhibit, and run the day to day operations for

the Saint Petersburg Exhibit.

27.    Under the terms of the Final Agreement, One-Go-Events was to be responsible for one fifth (1/5) of all the startup expenses and operating costs for the Saint Petersburg Exhibit.

28.    Under its agreement with Premier, JAM was entitled to fifty (50%) percent of the net profits up to and including an amount equal to the aggregate of all local costs plus the $500,00.00 license fee owed to Premier by JAM.  Thereafter, JAM was to be entitled to thirty percent (30%) of all additional net profits.

29.    In exchange for the services provided by One-Go-Events under the Final Agreement, JAM agreed to pay One-Go-Events one-fifth (1/5) of the net profits realized by JAM.

30.    One-Go-Events and JAM did not execute the Final Agreement but the parties were bound by the Final Agreement and every action taken by One-Go-Events was taken in furtherance of, and pursuant to, the Final Agreement.

31.    JAM and One-Go-Events agreed upon all the terms of the Final Agreement.

32.    It was within the custom and practice of the event planning industry for the Final Agreement not to be executed.

33.    It was the parties' intent that the Final Agreement would not be executed until just shortly before the launching of the Bodies Exhibit.

34.    The Final Agreement does not contain any express reservations of the parties' rights not to be bound without a formal written contract.

## COUNT I (BREACH OF CONTRACT)

35.    Plaintiff One-Go-Events repeats each and every allegation contained in paragraphs 1 through 34 of the Amended Complaint as if set forth at length herein.

36.    On April 12, 2007, Mr. Zimmer notified One-Go-Events that Premier had encountered a delay in providing the specimens for the Bodies Exhibit, and he suggested that the opening of the Bodies Exhibit be delayed for two weeks.

37.    One-Go-Events accepted this delay of the schedule and continued to work with Premier regarding preparation of the venue and local marketing materials.

38.    One-Go-Events took steps to provide insurance to JAM relating to the exhibit.

39.    On May 29, 2007, JAM provided further notice to One-Go-Events of delays in obtaining the specimens for the Bodies Exhibit.  As a result of these additional delays, the opening of the Bodies Exhibit was re-scheduled to June 16, 2007.

40.    On May 22, 2007 and May 23, 2007, representatives of Premier and JAM traveled to Saint Petersburg in advance of the planned opening of the Bodies Exhibit. One-Go-Events assisted Premier and JAM in obtaining the appropriate visas and paid for all of the travel accommodations for the trip.

41.    Shortly before the planned opening of the Bodies Exhibit, the specimens were detained by Russian customs officials and the opening was once again delayed until June 23, 2007 at the earliest.  This opening did not occur.

42.    During these delays, Mr. Zimmer advised One-Go-Events that JAM would not be paying Premier the $500,000.00 license fee contemplated by their agreement until the Bodies Exhibit had actually opened, and thus, further advised One-Go-Events not to

pay Premier the $100,000.00 payment contemplated under the Final Agreement until the exhibit launched, since that represented one-fifth of the license payment owed to Premier by JAM.

43.     In reliance upon these instructions, One-Go-Events did not make the $100,000.00 payment to Premier in advance of the opening of the Bodies Exhibit.

44.     The Bodies Exhibit never opened as planned.

45.     One-Go-Events had fully complied with its obligations under the Final Agreement with respect to presenting and marketing the exhibition.

46.     JAM accepted One-Go-Events' performance of its obligations under the Final Agreement.

47.     JAM failure to perform its responsibilities under the Final Agreement constituted a material breach of the Final Agreement.

48.     As a direct and proximate result of defendant's material breach of contract, plaintiff One-Go-Events suffered and will continue to suffer pecuniary losses and damages.

49.     On June 18, 2007, One-Go-Events stopped expending any further money and resources in presenting and marketing the Bodies Exhibit.

50.     One-Go-Events had paid and was out of pocket the sum of €443,248.25 in connection with the work done for the Bodies Exhibit.

51.     Plaintiff One-Go-Events is entitled to recovery from JAM of the costs plaintiff incurred in performance of the Final Agreement.

52.     But for JAM's material breach of the Final Agreement, plaintiff One-Go-Events would have earned, in addition, approximately $300,000.00 in profits.

- 8 -

53.     Plaintiff One-Go-Events is entitled to recovery from JAM of the profits plaintiff would have earned but for JAM's material breach of the Final Agreement.

54.     Although duly demanded, defendant has failed to pay plaintiff the amounts due and owing under the Final Agreement

## COUNT II (UNJUST ENRICHMENT)

55.     Plaintiff One-Go-Events repeats each and every allegation contained in paragraphs 1 through 54 of the Amended Complaint as if set forth at length herein.

56.     JAM's knowing acceptance of the goods and services and/or allocation of resources and personnel provided by One-Go-Events and thereafter failing to perform under the Final Agreement and refusing to pay plaintiff One-Go-Events the sums due and owing plaintiff under the Final Agreement resulted in an unjust enrichment in favor of JAM, which was inequitable and to One-Go-Events' detriment.

## COUNT III (BREACH OF SETTLEMENT AGREEMENT)

57.     Plaintiff One-Go-Events repeats each and every allegation contained in paragraphs 1 through 56 of the Amended Complaint as if set forth at length herein.

58.     In June 2007, One-Go-Events entered into a settlement agreement with Mr. Zimmer on behalf of JAM, calling for JAM to pay €450,000.00 to One-Go-Events.

59.     Despite One-Go-Events' acceptance of this offer, no payments were ever made by JAM to One-Go-Events.

60.     JAM, wrongfully, and in breach of the settlement agreement, withheld payment of the agreed upon settlement amount.

WHEREFORE, plaintiff One-Go-Events respectfully prays:

a.      that judgment be entered in favor of plaintiff against defendant for the

relief sought in COUNT I of the Amended Complaint;

b.      that judgment be entered in favor of plaintiff and against defendant for the

relief sought in COUNT II of the Amended Complaint;

c.      that judgment be entered in favor of plaintiff and against defendant for the

relief sought in COUNT III of the Amended Complaint;

d.      that judgment be entered in favor of plaintiff and against defendant for

costs and attorneys' fees incurred in connection with the subject matter of the Amended

Complaint; and

d.      that judgment be entered in favor of plaintiff and against defendant for

such other and further relief the Court may deem equitable and just.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff One-Go-Events hereby demands a trial by jury as to all triable issues.

Dated:  December 20, 2007

LYONS & FLOOD, LLP
Attorneys for Plaintiff
ONE-GO-EVENTS BENELUX BV


By:    _____

Kirk M. Lyons (KL-1568)
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400


U:\kmhldocs\2641002\Motions\Proposed Amended Complaint.doc

# EXHIBIT 1

## CO-PROMOTER AGREEMENT

THIS CO-PROMOTER AGREEMENT (this "Agreement"), made as of this _____ day of _____, 2007, by and between JAM Exhibitions, LLC, a Delaware limited liability company, having its principal place of business at 207 West Goethe, Chicago, Illinois 60610 ("JAM"), and One-Go-Events Benelux BV, a Netherlands corporation, having its principal place of business at Singel 92, 3112 GS Schiedam, The Netherlands ("ONE-GO-EVENTS").

WHEREAS, JAM, through a joint venture with an affiliate of Concert Production International ("CPI"), is currently presenting and promoting tour exhibits throughout the world of professional, high quality human anatomy, containing plastinated/polymer preserved human anatomical bodies or organs (the "Exhibition");

WHEREAS, ONE-GO-EVENTS is a promotion company located in the Netherlands, which is experienced in the organization and logistical aspects of publicly accessible events, such as cultural exhibitions; and

WHEREAS, the parties wish to work together to promote and present an Exhibition in Saint Petersburg, Russia (the "Saint Petersburg Exhibition"), upon the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, the parties hereto agree as follows:

1.    Purpose. The Saint Petersburg Exhibition shall be used for the public and private presentation of plastinated/polymer preserved human anatomical bodies or organs ("Specimens") for viewing and/or education with the intention of selling admission tickets and/or for the purposes of creating other revenue generating activities to generate a profit and shall include any or all Specimens, promotional activities, advertising, and operations associated with the Saint Petersburg Exhibitions.

2.    Term of the Saint Petersburg Exhibition; Term of this Agreement. The Saint Petersburg Exhibition will open on May 26th, 2007 and shall run until October 24th, 2007. Set up for the exhibition will commence on the premises on or around _____ th, 2007. Once the Saint Petersburg Exhibition closes, this Agreement shall terminate and will be deemed null and void and of no further force or effect, except that Sections 9, 11, 12, 13, 14 and 22 shall survive any termination of this Agreement.

3.    Payment. Upon execution of this Agreement, ONE-GO-EVENTS shall pay to JAM, by wire transfer $100,000.00, which represents an amount equal to one-fifth (1/5) of the $500,000.00 guaranteed payment owed by JAM for presentment of the Saint Petersburg Exhibition.

4.    Obligations of ONE-GO-EVENTS. ONE-GO-EVENTS shall, under the direction and subject to the approval of JAM, engage in all of the following activities:

(a) make all local arrangements, and obtain all rights, permits and licenses as may be required, for the presentation of the Saint Petersburg Exhibition;

(b) use commercially reasonable efforts to ensure that all installation requirements of the Saint Petersburg Exhibition will be completed sufficiently in advance of the opening of the Saint Petersburg Exhibition in accordance with the business plan and budget attached hereto as Schedule A;

(c) run the day-to-day operations in connection with the Saint Petersburg Exhibition;

(d) develop and implement a comprehensive admission and sales program, including ticket sales, telephone sales, media and sales blitzes, box office, group sales, and other means to maximize attendance at the Saint Petersburg Exhibition in accordance with the business plan and budget attached hereto as Schedule A;

(e) immediately notify in writing JAM of any damage, theft, or loss to the Saint Petersburg Exhibition or the Specimens, or in case of any event which threatens or is likely to threaten the safety and security of the Specimens;

(f) not allow any food or beverage to be allowed in the Saint Petersburg Exhibition at any time either during normal business hours or special events;

(g) upon reasonable request from JAM, arrange to meet with representatives of JAM to review the budget and the progress and preparation of the Saint Petersburg Exhibition;

(f) take care of reporting in accordance with the following:

(i) daily summary sheets (weekend reports to be delivered on each Monday) are to be produced stating unit sales, gross revenue by type and price level, (sample reports to be provided);

(ii) amounts reported will be reconcilable to Deposits whether Cash or by type of Credit Card by date. All fees, if any, associated with Credit Cards are to be reported separately;

(iii) any cash balances/floats held at the venue to fund expenditures will be reconcilable to Deposits and Disbursements;

(iv) all Disbursements will have original documentation supporting expense reporting. Sales Receipts will be used for expenses; and

(v) additional reporting will be developed as required.

5.    Revenue/Operating Costs/Funding. Any and all revenues received by or paid to ONE-GO-EVENTS in connection with the Saint Petersburg Exhibition shall be deemed revenues pursuant to this Agreement. Any and all revenues received by or paid to ONE-GO-EVENTS,

including but not limited to revenue derived from fees, commissions, ticket services charges, rebates, or sponsorships from concessionaires, sponsors, parking services, food services, or clothing sales at the Saint Petersburg Exhibition shall be deemed revenues pursuant to this Agreement. ONE-GO-EVENTS shall be responsible for (i) one-fifth (1/5) of all of the operating costs of the Saint Petersburg Exhibition and (ii) one-fifth (1/5) of the cash required to start up the Saint Petersburg Exhibition.

6.       Profits/Losses. The profits and losses will be allocated in accordance with the business plan and budget attached hereto as Schedule A and any cash flow shall be distributed as follows: cash distributions to ONE-GO-EVENTS will be paid within the same reporting period that payments are made to Premier Exhibitions, Inc. ("Premier"), the licensor. Cash will be distributed from surplus cash flow and may not, during the course of the term, be the same as profits earned. Cash calls may be made to cover operating losses at any time. JAM is entitled to four-fifths (4/5) of the profits from the Saint Petersburg Exhibition and JAM is liable for four-fifths (4/5) of the losses of the Saint Petersburg Exhibition. ONE-GO-EVENTS is entitled to one-fifth (1/5) of the profits from the Saint Petersburg Exhibition and ONE-GO-EVENTS is liable for one-fifth (1/5) of the losses of the Saint Petersburg Exhibition.

        a.       Profit Formula. JAM acknowledges the following formula: First, net profit up to and including an amount equal to the aggregate of all local costs plus the guarantee payment due to Premier are shared 50% by Premier and 50% by JAM (i.e., the "50:50 split point"), and thereafter, all additional net profits shall be shared 70% by Premier and 30% by JAM. ONE-GO-EVENTS is entitled to one-fifth (1/5) of the JAM share as illustrated in the PSO Tab of the attached business plan, Schedule A.

7.       Guaranty of Payment. ONE-GO-EVENTS hereby unconditionally, absolutely and irrevocably guarantees to JAM, and its successors, endorsees, transferees and assigns, the full and prompt payment when due of the payments due to JAM under or in connection with Sections 3, 5 and 6 of this Agreement (the "Payment Guaranty"). This Payment Guaranty is a present and continuing guaranty of payment and not of collectability, and JAM shall not be required to prosecute collection, enforcement or other remedies against ONE-GO-EVENTS or to enforce or resort to any collateral for the repayment of the Payment Guaranty or other rights or remedies pertaining thereto, before calling on ONE-GO-EVENTS for payment. ONE-GO-EVENTS hereby waives all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, notices of acceptance of this Guaranty and of the existence, creation, or incurring of new or additional indebtedness, and demands and notices of every kind.

8.       Operations; Duties.

        a.       ONE-GO-EVENTS Role. ONE-GO-EVENTS shall operate the Saint Petersburg Exhibition, including, but not limited to, setting up staffing, salaries, advertising and production. ONE-GO-EVENTS will fund all local operating expenses (e.g. staffing, salaries, etc.) and will submit the necessary supporting detail to JAM for periodic reimbursement. ONE-GO-EVENTS must get the prior approval of JAM for any variance outside the business plan and budget attached hereto as Schedule A. ONE-GO-EVENTS hereby agrees to operate the Saint Petersburg Exhibition in a commercially

responsible manner in accordance with the terms of this Agreement and as otherwise reasonably directed by JAM.

b.    Premier Role,    JAM and ONE-GO-EVENTS acknowledge that the installation of the Saint Petersburg Exhibition is done by Premier, all in accordance with the terms of the business plan and budget attached hereto as Schedule A.

8.    Books and Records. Each party shall have the right to inspect the books and records of the other party solely in connection with the Saint Petersburg Exhibition. The party requesting such examination (the "Requesting Party") shall notify the other party (the "Audited Party") in writing, upon at least ten (10) days prior notice, and the Audited Party shall make their books and records available to the Requesting Party at such time as requested in the notice. If the audit discloses an understatement in the net profits of the Audited Party by more than five percent (5%) than the Audited Party shall pay such difference to the Requesting Party and shall also pay to Requesting Party the costs and expenses of such audit.

9.    Termination. JAM shall have the right to terminate ONE-GO-EVENTS for Cause. For purposes of this Agreement, the term "Cause" shall mean any of the following actions by ONE-GO-EVENTS: (a) a failure to comply with any of the material terms of this Agreement, which shall not be cured within 10 days after written notice; (b) engagement in misconduct injurious to the Saint Petersburg Exhibition or any other Exhibition; (c) intentional misappropriation of property of the Saint Petersburg Exhibition or (d) the commission by ONE-GO-EVENTS of an act of fraud or embezzlement. ONE-GO-EVENTS shall be entitled to no further compensation or other benefits under this Agreement subsequent to this termination.

10.    Confidentiality.

a.    At all times after the date hereof, ONE-GO-EVENTS shall not disclose or use any information concerning JAM, the Exhibition, the Saint Petersburg Exhibition or the Specimens including, but not limited to, business and financial conditions, services and clients, any proprietary or strategic information, marketing plans, strategies, results, information regarding the producing and promoting of the Exhibition, the processes involved in creating the Specimens or other confidential information divulged to or learned by ONE-GO-EVENTS about any of the foregoing from any source whatsoever ("JAM Confidential Information"), provided, that such obligation shall not apply to any JAM Confidential Information (i) to the extent that it legally is or becomes part of public or industry knowledge from authorized sources or (ii) which ONE-GO-EVENTS is required by law to disclose (but only to the extent required to be so disclosed). Within thirty (30) days of termination of this Agreement, ONE-GO-EVENTS shall immediately return to JAM or otherwise dispose of as JAM may direct all pamphlets, literature, contractual documentation, photographs, catalogues, advertising material, specifications, cost estimates and other materials, documents and papers whatsoever belonging to JAM and sent to ONE-GO-EVENTS relating to the Saint Petersburg Exhibition.

b.    At all times after the date hereof, JAM shall not disclose or use any information concerning ONE-GO-EVENTS including, but not limited to, business and financial conditions, services and clients, any proprietary or strategic information,

marketing plans, strategies, results, or other confidential information regarding ONE-GO-EVENTS divulged to or learned by JAM from any source whatsoever ("ONE-GO-EVENTS Confidential Information"), provided, that such obligation shall not apply to any ONE-GO-EVENTS Confidential Information (i) to the extent that it legally is or becomes part of public or industry knowledge from authorized sources or (ii) which either of the parties is required by law to disclose (but only to the extent required to be so disclosed).

11.    Indemnification.

a.    ONE-GO-EVENTS agrees to indemnify, defend and hold harmless JAM, its subsidiaries, parent companies, affiliates, agents, and assigns and their respective agents, officers, employees, and directors, from and against any and all losses, damages, liabilities, claims, demands, suits and expenses that JAM may incur or be liable for as a result of any claim, suit or proceeding made or brought against JAM based upon, arising out of, or in connection with the Saint Petersburg Exhibition of ONE-GO-EVENTS' breach of any of its representations, duties or obligations hereunder.

b.    JAM agrees to indemnify, defend and hold harmless ONE-GO-EVENTS, its subsidiaries, parent companies, affiliates, agents, and assigns and their respective agents, officers, employees, and directors, from and against any and all losses, damages, liabilities, claims, demands, suits and expenses that ONE-GO-EVENTS may incur or be liable for as a result of any claim, suit or proceeding made or brought against ONE-GO-EVENTS based upon, arising out of, or in connection with JAM's breach of any of its representations, duties or obligations hereunder.

12.    Trademarks. It is expressly agreed and understood that ONE-GO-EVENTS shall have no rights to any of the trademarks utilized for the Saint Petersburg Exhibition and the Saint Petersburg Exhibition logos.

13.    Non-Competition. ONE-GO-EVENTS agrees that, during the term of the Saint Petersburg Exhibition, and for a period of one (1) year after the conclusion of the Saint Petersburg Exhibition, it will not, either directly or indirectly, engage in any other business relating to the presentation of an exhibition concerning Specimens, either as a producer, presenter, proprietor, partner, investor, shareholder, director, officer, employee, principal, agent, advisor, or consultant. It is the intention of this provision to preclude not only direct competition but also all forms of indirect competition, such as consultation for competitive businesses, or any assistance or transmittal of information of any kind or nature whatsoever which would be of any material assistance to a competitor.

14.    Notices. Any notice required or permitted to be given under this Agreement shall be in writing and shall be delivered either by personal delivery, by nationally recognized overnight courier or by certified or registered mail, return receipt requested, addressed to JAM or ONE-GO-EVENTS at the address set forth above or at such other address as the party affected shall have previously designated by written notice given to the Business and the other party in the manner hereinabove set forth. Notices shall be deemed given one (1) day after sent, if sent by overnight courier; when delivered and receipted for, if hand delivered; or when receipted for (or upon the date of attempted delivery where delivery is refused or unclaimed) if sent by certified or

CHGO1\30917730.2                                    5

registered mail.

15.    Representations and Warranties. Each of JAM and ONE-GO-EVENTS represent and warrant that neither the execution, delivery nor performance of this Agreement constitutes a breach or violation of any contract or agreement to which either is a party or by which either is in any manner bound. Each of JAM and ONE-GO-EVENTS further represent and warrant that neither has any interests or obligations, nor will either acquire any interests or obligations, which conflict with or hamper either's ability to perform as required under this Agreement.

16.    Force Majeure. If due to acts of God, insurrection, fire, elements, national emergency, or any other similar cause outside of the reasonable control of either party to this Agreement ("Force Majeure") the Saint Petersburg Exhibition is cancelled, delayed or the performance of either party under the terms of this Agreement is made impossible, the parties agree that such cancellation, postponement or failure to perform shall not be considered a breach of this agreement. In such event, however, the parties agree to use their best efforts to reschedule the Saint Petersburg Exhibition.

17.    Publicity. Each of the parties agree that no press announcement or press release in connection with this Agreement shall be made unless the other party hereto shall have given its written consent to such announcement (including the form and content thereof), which consent shall not be unreasonably withheld. The parties acknowledge that a press conference will be held (TBA) in Saint Petersburg.

18.    Severability. If any of the provisions of this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been included in this Agreement. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

19.    No Third-Party Beneficiaries. None of the provisions of this Agreement shall be for the benefit of or enforceable by any third parties, including, without limitation, creditors of the Exhibition, JAM or ONE-GO-EVENTS.

20.    No Waiver. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or of any covenant, agreement, term or condition. Any party to this Agreement by an instrument in writing may, but shall be under no obligation to, waive any of its rights or any conditions to its obligations hereunder, or any duty, obligation or covenant of any other party to this Agreement, but no waiver shall be effective unless in writing and signed by the party to this Agreement making such waiver. No waiver shall affect or alter the remainder of the terms of this Agreement but each and every covenant, agreement, term and condition hereof shall continue in full force and effect with respect to any other then existing or subsequent breach.

21.    Applicable Law; Jurisdiction. ALL MATTERS IN CONNECTION WITH THE POWER, AUTHORITY AND RIGHTS OF THE PARTY'S AND ALL MATTERS PERTAINING TO THE OPERATION, CONSTRUCTION, INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT SHALL BE GOVERNED AND DETERMINED BY THE INTERNAL LAWS OF THE NETHERLANDS, AND ANY DISPUTES WHICH CANNOT BE RESOLVED AMICABLY SHALL BE EXCLUSIVELY SUBMITTED TO THE COMPETENT COURT IN THE HAUGE, NETHERLANDS.

22.    Successors and Assigns. The rights and obligations of JAM under this Agreement shall inure to the benefit of, and shall be binding upon, any successors of JAM and may be assigned, by JAM without obtaining ONE-GO-EVENTS' prior consent to any person (i) which at the time controls JAM, (ii) which succeeds to substantially all of the assets of JAM or (iii) to any to be formed joint venture between CPI and JAM. Any assignee shall assume and agree in writing to be bound by all of the obligations of JAM under this Agreement. The performance of ONE-GO-EVENTS' services is personal and shall not be assignable or be required of anyone other than ONE-GO-EVENTS.

23.    Entire Agreement/Amendments. This Agreement contains the entire understanding between the parties and supersedes all prior written and oral agreements between them. There are no representations, agreements, arrangements or understandings, oral or written, between the parties to this Agreement relating to the subject matter of this Agreement, which are not fully expressed herein. This Agreement may not be amended or modified except by written instrument executed by both JAM and ONE-GO-EVENTS.

24.    Relationship of the Parties. Each party shall perform its duties hereunder as an independent contractor. For purposes of this Agreement, the parties shall be considered co-producers of the Saint Petersburg Exhibition. This Agreement shall not be a license agreement or royalty agreement and all fees paid to JAM under this Agreement are deemed to be fees for the goods and/or services it provides. Neither party shall be or be deemed to be, or hold itself out as being, an agent of the other, and neither party shall be able to bind the other to any agreement with any third party, nor represent to third parties that they have the power to act as agent of the other, except as required to perform its duties pursuant to this Agreement. Nothing herein shall be implied to mean that the parties are agent, partner or joint venturer of the other party.

25.    Counterparts. This agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute but one and the same document. Signature by facsimile is hereby authorized.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

IAM Exhibitions, LLC

By: _____
    Name:
    Title:

One-Go-Events Benelux BV

By: _____
    Name:



# EXHIBIT 2

**BODIES - THE EXHIBITION**
**BUSINESS PLAN LOCAL CURRENCY** — St. Petersburg, Russia

| | | |
|---|---|---|
| **VENUE** .................................................. | **Eurasia** | |
| Start Date ............................................. | Sat May 19/07 | |
| End Date ............................................... | Sun Oct 21/07 | |
| | | |
| **LOCAL CURRENCY** ............................... | **Euro** | |
| FX Rate to $USD ................................... | 0.830000 | |
| | | |
| Hourly Capacity ..................................... | 800 | |
| Hours per Day ....................................... | 10 | |
| Days per Week ...................................... | 7 | |
| Weekly Capacity .................................... | 56,000 | |
| # Of Weeks ........................................... | 26 | |
| **Total RUN Capacity** | 1,454,880 | |

| | | | |
|---|---|---|---|
| **Forecasted Attendance** | | **300,000** | **21%** |

**Ticket Scaling**

| | | | |
|---|---|---|---|
| 1 | Adults | 85.00% | 255,000 |
| 2 | Seniors | 5.00% | 15,000 |
| 3 | Children | 5.00% | 15,000 |
| 4 | Private Groups | 3.00% | 9,000 |
| 5 | School Groups | 2.00% | 6,000 |
| 6 | | | – |
| 7 | | | – |
| 8 | | | – |
| 9 | | | – |
| 10 | | | – |
| 11 | | | – |
| 12 | | | – |
| 13 | | | – |
| 14 | | | – |
| 15 | | | – |
| | Total Attendance | 100.00% | 300,000 |

**Ticket Prices**

| | | Gross | Net of 0.00% | Net Gross |
|---|---|---|---|---|
| 1 | Adults | € 15.00 | € 15.00 | |
| 2 | Seniors | € 12.00 | € 12.00 | |
| 3 | Children | € 10.00 | € 10.00 | |
| 4 | Private Groups | € 12.00 | € 12.00 | |
| 5 | School Groups | € 10.00 | € 10.00 | |
| 6 | | 0 | € 0.00 | |
| 7 | | 0 | € 0.00 | |
| 8 | | 0 | € 0.00 | |
| 9 | | 0 | € 0.00 | |
| 10 | | 0 | € 0.00 | |
| 11 | 0 | 0 | € 0.00 | |
| 12 | 0 | 0 | € 0.00 | |
| 13 | 0 | 0 | € 0.00 | |
| 14 | 0 | 0 | € 0.00 | |
| 15 | 0 | 0 | € 0.00 | |

**Net Ticket Revenues**

| | | | |
|---|---|---|---|
| 1 | Adults | 3,825,000 | 3,825,000 |
| 2 | Seniors | 180,000 | 180,000 |
| 3 | Children | 150,000 | 150,000 |
| 4 | Private Groups | 108,000 | 108,000 |
| 5 | School Groups | 60,000 | 60,000 |
| 6 | | 0 | – |
| 7 | | 0 | – |
| 8 | | 0 | – |
| 9 | | 0 | – |
| 10 | | 0 | – |
| 11 | 0 | 0 | – |
| 12 | 0 | 0 | – |
| 13 | 0 | 0 | – |
| 14 | 0 | 0 | – |
| 15 | 0 | 0 | – |
| | SubTotal | 4,323,000 | 4,323,000 |

avg net tkt **14.41**

**Ancillary Revenue**

| | | | |
|---|---|---|---|
| Ticket Rights | | | – |
| Local Sponsorship | | | – |
| Audio Tour | € 5.00 | 15,000 | 45,000 |
| Merchandise | € 1.00 | | 300,000 |
| Venue Revenue Sharing | | | – |
| Catalogue Sales | | | – |
| Other | | | – |
| SubTotal Ancillary | | | 345,000 |

| | | |
|---|---|---|
| **TOTAL GROSS REVENUE** | | 4,668,000 |

**Estimated Expenses** — **% Total Gro**

**Startup Costs**

| | | |
|---|---|---|
| Venue rent | – | 0% |
| Marketing | – | (0) |
| Installation | (252,000) | (0) |
| Staffing | (4,150) | (0) |
| Venue – Construction | (150,000) | (0) |
| Venue – Operations | – | |
| Production related | (35,000) | (0) |
| Admin–Other Costs | – | – |
| | (441,150) | -9% |

**Operating Costs**

| | | |
|---|---|---|
| Venue rent | (120,000) | (0) |
| Marketing | (300,000) | (0) |
| Installation | (50,000) | (0) |
| Staffing | (133,800) | (0) |
| Venue – Construction | – | |
| Venue – Operations | (36,400) | (0) |
| Production related | (26,000) | (0) |
| Admin–Other Costs | (97,814) | -2% |
| | (764,014) | -16% |

| | | |
|---|---|---|
| **Total Expenses** | (1,205,164) | -26% |
| Guarantee to Premier [Exhibit Owner] – Local Currency | (415,000) | -9% |
| **PROFIT** | **3,047,836** | 65% |

BODIES - THE EXHIBITION

SUSPENDED ANIMATION PAGE
DO NOT TYPE ANYTHING ON THIS PAGE

BUSINESS PLAN $USD          St. Petersburg, Russia

| | | | | |
|---|---|---|---|---|
| VENUE ......................................................... | | | **Eurasia** | |
| Start Date ................................................. | | | Sat May 19/07 | |
| End Date ................................................... | | | Sun Oct 21/07 | |
| | | | | |
| LOCAL CURRENCY ...................................... | | | **Euro** | |
| FX Rate to $USD ........................................ | | | 0.830000 | |
| | | | | |
| Hourly Capacity ........................................ | | | 800 | |
| Hours per Day ........................................... | | | 10 | |
| Days per Week .......................................... | | | 7 | |
| Weekly Capacity ....................................... | | | 56,000 | |
| # Of Weeks .............................................. | | | 26 | |
| **Total RUN Capacity** | | | **1,454,880** | |

| | | | | |
|---|---|---|---|---|
| Forecasted Attendance | | | 300,000 | 21% |

**Ticket Scaling**

| | | | | |
|---|---|---|---|---|
| 1 | Adults | 85.00% | 255,000 | |
| 2 | Seniors | 5.00% | 15,000 | |
| 3 | Children | 5.00% | 15,000 | |
| 4 | Private Groups | 3.00% | 9,000 | |
| 5 | School Groups | 2.00% | 6,000 | |
| 6 | 0 | 0.00% | – | |
| 7 | 0 | 0.00% | – | |
| 8 | 0 | 0.00% | – | |
| 9 | 0 | 0.00% | – | |
| 10 | 0 | 0.00% | – | |
| 11 | 0 | 0.00% | – | |
| 12 | 0 | 0.00% | – | |
| 13 | 0 | 0.00% | – | |
| 14 | 0 | 0.00% | – | |
| 15 | 0 | 0.00% | – | |
| | Total Attendance | 100.00% | 300,000 | |

**Ticket Prices**

| | | Gross | Net of 0.00% | Net Gross | Local Currency – Euro | Var to Local Page, must be zero |
|---|---|---|---|---|---|---|
| 1 | Adults | 18.07 | $ 18.07 | | 15.00 | – |
| 2 | Seniors | 14.46 | $ 14.46 | | 12.00 | – |
| 3 | Children | 12.05 | $ 12.05 | | 10.00 | – |
| 4 | Private Groups | 14.46 | $ 14.46 | | 12.00 | – |
| 5 | School Groups | 12.05 | $ 12.05 | | 10.00 | – |
| 6 | 0 | – | $ – | | | |
| 7 | 0 | – | $ – | | | |
| 8 | 0 | – | $ – | | | |
| 9 | 0 | – | $ – | | | |
| 10 | 0 | – | $ – | | | |
| 11 | 0 | – | $ – | | | |
| 12 | 0 | – | $ – | | | |
| 13 | 0 | – | $ – | | | |
| 14 | 0 | – | $ – | | | |
| 15 | 0 | – | $ – | | | |

**Net Ticket Revenues**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Adults | 4,608,434 | | 4,608,434 | 3,825,000 | – |
| 2 | Seniors | 216,867 | | 216,867 | 180,000 | – |
| 3 | Children | 180,723 | | 180,723 | 150,000 | – |
| 4 | Private Groups | 130,120 | | 130,120 | 108,000 | – |
| 5 | School Groups | 72,289 | | 72,289 | 60,000 | – |
| 6 | 0 | | | – | | |
| 7 | 0 | | | – | | |
| 8 | 0 | | | – | | |
| 9 | 0 | | | – | | |
| 10 | 0 | | | – | | |
| 11 | 0 | | | – | | |
| 12 | 0 | | | – | | |
| 13 | 0 | | | – | | |
| 14 | 0 | | | – | | |
| 15 | 0 | | | – | | |
| | SubTotal | 5,208,434 | | 5,208,434 | 4,323,000 | – |
| | | | | **avg net tkt** **17.36** | #NAME? | #NAME? |

**Ancillary Revenue**

| | | | | |
|---|---|---|---|---|
| Ticket Rights | | – | | |
| Local Sponsorship | | – | | |
| Audio Tour | | 54,217 | 45,000 | |
| Merchandise | | 361,446 | 300,000 | |
| Venue Revenue Sharing | | – | | |
| Catalogue Sales | | – | | |
| Other | | – | | |
| SubTotal Ancillary | | 415,663 | 345,000 | – |

| | | | | |
|---|---|---|---|---|
| **TOTAL GROSS REVENUE** | | **5,624,096** | **4,668,000** | **–** |

**Estimated Expenses**          % Total Gross Revenues

**Startup Costs**

| | | | | |
|---|---|---|---|---|
| Venue rent | – | 0% | – | |
| Marketing | – | 0% | – | |
| Installation | (303,614) | –5% | (252,000) | – |
| Staffing | (5,000) | 0% | (4,150) | – |
| Venue – Construction | (180,723) | –3% | (150,000) | – |
| Venue – Operations | – | 0% | – | |
| Production related | (42,169) | –1% | (35,000) | – |
| Admin–Other Costs | – | 0% | – | |
| | (531,506) | –9% | (441,150) | – |

**Operating Costs**

| | | | | |
|---|---|---|---|---|
| Venue rent | (144,578) | –3% | (120,000) | – |
| Marketing | (361,446) | –6% | (300,000) | – |
| Installation | (60,241) | –1% | (50,000) | – |
| Staffing | (161,205) | –3% | (133,800) | – |
| Venue – Operations | (43,855) | –1% | (36,400) | – |
| Production related | (31,325) | –1% | (26,000) | – |
| Admin–Other Costs | (117,848) | –2% | (97,814) | – |
| | (920,498) | –16% | (764,014) | – |

| | | | | |
|---|---|---|---|---|
| **Total Expenses** | (1,452,005) | –26% | (1,205,164) | – |
| Guarantee to Premier [Exhibit Owner] – Local Currency | (500,000) | –9% | (415,000) | – |
| **PROFIT** | **3,672,092** | **65%** | **3,047,836** | **–** |

| | | | | | |
|---|---|---|---|---|---|
| Premier Exhibits first split | 50% | 976,002 | 17% | 810,082 | – |
| Premier Exhibits second split | 60% | | | | |
| Premier Exhibits third split | 70% | 1,204,061 | 21% | 999,370 | – |
| **Premier share profit** | | 2,180,063 | 39% | 1,809,452 | – |
| | | | | | |
| CPI/Jam first split | 50% | 976,002 | 17% | 810,082 | – |
| CPI/Jam second split | 40% | | | | |
| CPI/Jam third split | 30% | 516,026 | 9% | 428,302 | – |
| **CPI/Jam share profit** | | 1,492,028 | 27% | 1,238,384 | – |
| | | | | | |
| Estimated Project-Specific Overheads | | (432,795) | –8% | (359,219) | 73,575 |
| | | | | | |
| CPI/JAM Net Profit | | 1,059,234 | 19% | 879,164 | 73,575 |
| | | | | | |
| Breakeven $$$ ...................................... | | 1,952,005 | 35% | 1,620,164 | – |
| **Breakeven tickets** ......................... | | **112,433** | | **112,433** | **–** |

| | | | | |
|---|---|---|---|---|
| Checksum Profit | | 3,672,092 | 3,047,836 | – |
| Premier/CPI/Jam Share Profit | | 3,672,092 | 3,047,836 | – |
| Variance, must be zero | | | – | – |

**BODIES - THE EXHIBITION**

St. Petersburg, Russia
**Ancillary Revenue**

| | | | 6-MONTH RUN |
|---|---|---|---|
| | | | LOCAL CURRENCY SUBTOTALS |

**TICKET RIGHTS**

| | | - | € 0.00 |

| | | | Ticket Rights |

**LOCAL SPONSORSHIP**

| | | | Local Sponsorship |

**AUDIO TOUR**

| Revenue | € 5.00 | 15,000 | € 75,000.00 |
| Audio rental wands | | (30,000) | –€ 30,000.00 |
| Fixed Exp | | | |
| Fixed Exp | | | |
| Var Exp | | | |
| Var Exp | | | |
| Var Exp | | | |
| Net Revenue for Calc | | - | |
| Local Share | 0% | | |
| AUDIO TOUR NET | | - | |

| | | | Audio Tour |

**MERCHANDISE**

| Revenue | | 300,000 | € 300,000.00 |
| Fixed Exp | | | € 0.00 |
| Fixed Exp | | | |
| Fixed Exp | | | |
| Var Exp | | | |
| Var Exp | | | |
| Var Exp | | | |
| Net Revenue for Calc | | - | |
| Local Share | | - | |
| MERCH NET | | | - |

| | | | Merchandise |

**Partners' Shared Revenue With Venue – Where Applicable**

| | Portion of Net Gross Ticket | Attendance 300,000 | |
|---|---|---|---|
| Adults | - | 85.00% | - |
| Seniors | - | 5.00% | - |
| Children | - | 5.00% | - |
| Private Groups | - | 3.00% | - |
| School Groups | - | 2.00% | - |
| - | - | 0.00% | - |
| - | - | 0.00% | - |
| - | - | 0.00% | - |
| - | - | 0.00% | - |
| - | - | 0.00% | - |
| Gross | | 100.00% | - |

| Checksum BP-localCurr | - |
| Var, must be zero | - |

Venue is entitled to 100% of first - tickets.

| Exclusive Venue Revenue | - |

| Checksum % of Attd | 0.00% |
| Gross X % | - |
| Var, must be zero | - |

| SHARED REVENUE | - |

| | Attendance | Venue | Partners |
|---|---|---|---|
| | 1 | 0% | 0% |
| Adjust As Per Contract > | 150,000 | 70% | 30% |
| Adjust As Per Contract > | 250,000 | 80% | 20% |
| Adjust As Per Contract > | 350,000 | 85% | 15% |

| PARTNER SHARE | 20% | >>>>>>>> | - |
| VENUE SHARE | 80% | |
| Checksum total, must be zero | - | |

**Venue Share Alternate Gross Share Calc Where Applicable**

| AGC Gross | - |
| Exps | |
| Exps | |
| Exps | |
| | - |
| 15% | - | >>>>>>>>>>>>>>>>>>>>>>>> |

| | | | Partners' Shared Revenue With Venue – Where Applicable |

**CATALOGUE REVENUE**

| Revenue | | | |
| Fixed Exp | | | |
| Fixed Exp | | | |
| Fixed Exp | | | |
| Var Exp | | | |
| Var Exp | | | |
| Var Exp | | | |
| Net Revenue for Calc | | - | |
| Local Share | 0% | - | |
| CATALOGUE NET | | | - |

| | | | Catalogue Revenue |

**ANCILLS OTHER 3**

| | | | Ancills Other 3 |

| Subtotal Ancillary Revenue | | | 345,000 |

**BODIES—THE EXHIBITION**
**CASH PHASING**          St. Petersburg, Russia, Eurasia

| | | Enter Start Date > | May 19/07 | Jun | Jul | Aug | Sep | Oct | Nov 19/07 |
|---|---|---|---|---|---|---|---|---|---|
| 300,000 | | Attendance > | 42,857 | 42,857 | 42,857 | 42,857 | 42,857 | 42,857 | 42,857 |
| | | | 14.29% | 14.29% | 14.29% | 14.29% | 14.29% | 14.29% | 14.29% |
| **Net Gross** | 4,323,000 | | 617,571 | 617,571 | 617,571 | 617,571 | 617,571 | 617,571 | 617,571 |
| **Ancillary Revenue** | | | | | | | | | |
| Ticket Rights | – | | – | – | – | – | – | – | – |
| Local Sponsorship | – | | – | – | – | – | – | – | – |
| Audio Tour | 45,000 | | 6,429 | 6,429 | 6,429 | 6,429 | 6,429 | 6,429 | 6,429 |
| Merchandise | 300,000 | | 42,857 | 42,857 | 42,857 | 42,857 | 42,857 | 42,857 | 42,857 |
| Other | – | | – | – | – | – | – | – | – |
| Other | – | | – | – | – | – | – | – | – |
| Other | – | | – | – | – | – | – | – | – |
| SubTotal Ancillary | 345,000 | | 49,286 | 49,286 | 49,286 | 49,286 | 49,286 | 49,286 | 49,286 |
| **TOTAL GROSS REVENUE** | 4,668,000 | | 666,857 | 666,857 | 666,857 | 666,857 | 666,857 | 666,857 | 666,857 |
| **Estimated Expenses** | | | | | | | | | |
| **Startup Costs** | | | | | | | | | |
| Venue rent | – | | – | | | | | | |
| Marketing | – | | – | | | | | | |
| Installation | (252,000) | | (252,000) | | | | | | |
| Staffing | (4,150) | | (4,150) | | | | | | |
| Venue – Construction | (150,000) | | (150,000) | | | | | | |
| Venue – Operations | – | | – | | | | | | |
| Production related | (35,000) | | (35,000) | | | | | | |
| Admin–Other Costs | – | | – | | | | | | |
| | (441,150) | | (441,150) | – | – | – | – | – | – |
| **Operating Costs** | | | | | | | | | |
| Venue rent | (120,000) | | (17,143) | (17,143) | (17,143) | (17,143) | (17,143) | (17,143) | (17,143) |
| Marketing | (300,000) | | (42,857) | (42,857) | (42,857) | (42,857) | (42,857) | (42,857) | (42,857) |
| Installation | (50,000) | | (7,143) | (7,143) | (7,143) | (7,143) | (7,143) | (7,143) | (7,143) |
| Staffing | (133,800) | | (19,114) | (19,114) | (19,114) | (19,114) | (19,114) | (19,114) | (19,114) |
| Venue – Construction | – | | – | – | – | – | – | – | – |
| Venue – Operations | (36,400) | | (5,200) | (5,200) | (5,200) | (5,200) | (5,200) | (5,200) | (5,200) |
| Production related | (26,000) | | (3,714) | (3,714) | (3,714) | (3,714) | (3,714) | (3,714) | (3,714) |
| Admin–Other Costs | (97,814) | | (13,973) | (13,973) | (13,973) | (13,973) | (13,973) | (13,973) | (13,973) |
| | (764,014) | | (109,145) | (109,145) | (109,145) | (109,145) | (109,145) | (109,145) | (109,145) |
| **Total Expenses** | (1,205,164) | | (550,295) | (109,145) | (109,145) | (109,145) | (109,145) | (109,145) | (109,145) |
| **Guarantee to Premier** | $ (415,000) | | (415,000) | | | | | | |
| **PROFIT** | 3,047,836 | | (298,438) | 557,712 | 557,712 | 557,712 | 557,712 | 557,712 | 557,712 |
| Estimated PSO's | (432,795) | | (61,828) | (61,828) | (61,828) | (61,828) | (61,828) | (61,828) | (61,828) |
| **NET CASH CONTRIBUTION** | 2,615,041 | | (360,266) | 495,884 | 495,884 | 495,884 | 495,884 | 495,884 | 495,884 |
| Cumulative Cash Balance | | | (360,266) | 135,619 | 631,503 | 1,127,388 | 1,623,272 | 2,119,157 | 2,615,041 |

**BODIES - THE EXHIBITION**
**Project-Specific Overheads**
St. Petersburg, Russia


Executive Travel                                                    − € 20,000.00



| | |
|---|---|
| **Subtotal PSO's fixed** | **(20,000)** |


One-Go participation          33.33%                  − € 412,794.53



| | |
|---|---|
| **Subtotal PSO's variable** | **(412,795)** |

| | |
|---|---|
| **TOTAL PSO'S** | **(432,795)** |

**BODIES - THE EXHIBITION**
**St. Petersburg, Russia**
**Sensitivity / Breakevens / Etc.**

| 6-MONTH RUN | Forecast 21% | | 10% | 20% | 30% | 40% |
|---|---|---|---|---|---|---|
| Attendance | 300,000 | | 145,488 | 290,976 | 436,464 | 581,952 |
| Net Gross | 4,323,000 | | 2,096,482 | 4,192,964 | 6,289,446 | 8,385,928 |
| Ancillaries | 345,000 | | | | | |
| Operating Expenses | (764,014) | | (764,014) | (764,014) | (764,014) | (764,014) |
| Operating Profit | 3,903,986 | | 1,332,468 | 3,428,950 | 5,525,432 | 7,621,914 |
| Gtee | (415,000) | | (415,000) | (415,000) | (415,000) | (415,000) |
| Startup Expenses | (441,150) | | (441,150) | (441,150) | (441,150) | (441,150) |
| 6-MONTH RUN Profit / (Loss) | 3,047,836 | | 476,318 | 2,572,800 | 4,669,282 | 6,765,764 |

**Breakeven Tickets**

| | | |
|---|---|---|
| Operating Expenses | 53,020 | |
| Gtee | 28,799 | |
| Startup Expenses | 30,614 | |
| 6-MONTH RUN Breakeven | 112,433 | |

**WEEKLY**

| WEEKLY | | | | | | |
|---|---|---|---|---|---|---|
| Attendance | 11,538 | | 5,596 | 11,191 | 16,787 | 22,383 |
| Avg Net Gross | 166,269 | | 80,634 | 161,268 | 241,902 | 322,536 |
| Ancills | 13,269 | | - | - | - | - |
| Operating Expenses | (29,385) | | (29,385) | (29,385) | (29,385) | (29,385) |
| Operating Profit | 150,153 | | 51,249 | 131,883 | 212,517 | 293,151 |
| Gtee | (15,962) | | (15,962) | (15,962) | (15,962) | (15,962) |
| Startup Expenses | (16,967) | | (16,967) | (16,967) | (16,967) | (16,967) |
| WEEKLY Profit / (Loss) | 117,224 | | 18,320 | 98,954 | 179,588 | 260,222 |

**Breakeven Tickets**

| | | |
|---|---|---|
| Operating Expenses | 2,039 | |
| Gtee | 1,108 | |
| Startup Expenses | 1,177 | |
| WEEKLY Breakeven | 4,324 | |

**Weeks To Recoup From Operating Profit**

| | | | | | | |
|---|---|---|---|---|---|---|
| Gtee | 3 | | 8 | 3 | 2 | 1 |
| Startup Expenses | 3 | | 9 | 3 | 2 | 2 |
| Weeks to Recoup | 6 | | 17 | 6 | 4 | 3 |
| | | | | | | |
| Profit Weeks | 20 | | 9 | 20 | 22 | 23 |
| Checksum P/L Total | 3,047,836 | | 476,318 | 2,572,800 | 4,669,282 | 6,765,764 |
| Var, must be zero | - | | - | - | - | - |

**_Breakeven calculations_**

**Operating Expenses**

| | |
|---|---|
| Fixed | 764,014 |
| Var at Breakeven | - |
| **Operating Exps @ B/even** | 764,014 |
| | |
| **Gtee** | 415,000 |

**Startup Expenses**

| | |
|---|---|
| Fixed | 441,150 |
| Var at Breakeven | |
| **Startup Exps @ B/even** | 441,150 |

| | |
|---|---|
| Total Fixed Exps | 1,620,164 |

| 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|
| **727,440** | **872,928** | **1,018,416** | **1,163,904** | **1,309,392** | **1,454,880** |
| 10,482,410 | 12,578,892 | 14,675,375 | 16,771,857 | 18,868,339 | 20,964,821 |
| (764,014) | (764,014) | (764,014) | (764,014) | (764,014) | (764,014) |
| **9,718,396** | **11,814,878** | **13,911,361** | **16,007,843** | **18,104,325** | **20,200,807** |
| (415,000) | (415,000) | (415,000) | (415,000) | (415,000) | (415,000) |
| (441,150) | (441,150) | (441,150) | (441,150) | (441,150) | (441,150) |
| **8,862,246** | **10,958,728** | **13,055,211** | **15,151,693** | **17,248,175** | **19,344,657** |

| 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|
| **27,978** | **33,574** | **39,170** | **44,766** | **50,361** | **55,957** |
| 403,170 | 483,804 | 564,437 | 645,071 | 725,705 | 806,339 |
| - | - | - | - | - | - |
| (29,385) | (29,385) | (29,385) | (29,385) | (29,385) | (29,385) |
| **373,784** | **454,418** | **535,052** | **615,686** | **696,320** | **776,954** |
| (15,962) | (15,962) | (15,962) | (15,962) | (15,962) | (15,962) |
| (16,967) | (16,967) | (16,967) | (16,967) | (16,967) | (16,967) |
| **340,856** | **421,490** | **502,123** | **582,757** | **663,391** | **744,025** |

| 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|
| 1 | 1 | 1 | 1 | 1 | 1 |
| 1 | 1 | 1 | 1 | 1 | 1 |
| **2** | **2** | **2** | **1** | **1** | **1** |
| 24 | 24 | 24 | 25 | 25 | 25 |
| 8,862,246 | 10,958,728 | 13,055,211 | 15,151,693 | 17,248,175 | 19,344,657 |
| - | - | - | - | - | - |

**BODIES - THE EXHIBITION**

St. Petersburg, Russia
**Venue Rent**

|  | ENTER 6-MONTH RUN LOCAL CURRENCY SUBTOTALS |
|---|---|
| Description | |
| | |
| | **Startup** |
| Rent for 6 months (placeholder) | € 120,000.00 |
| | **Operations** |
| **Subtotal Venue Rent** | 120,000 |

**BODIES - THE EXHIBITION**

St. Petersburg, Russia
**Marketing / Advertising**

| Description | ENTER 6-MONTH RUN LOCAL CURRENCY SUBTOTALS |
|---|---|
| | **Startup** |
| Marketing & Advertising | € 300,000.00 |
| | **Operations** |
| **Subtotal Marketing / Advertising** | **300,000** |

**BODIES - THE EXHIBITION**

St. Petersburg, Russia
**Installation**

| Description | ENTER 6-MONTH RUN LOCAL CURRENCY SUBTOTALS |
|---|---|
| Premier installation | € 250,000.00 |
| Telephones and internet | € 2,000.00 |
| | **Startup** |
| Load out accural | € 50,000.00 |
| | **Operations** |
| **Subtotal Installation** | **302,000** |

**BODIES - THE EXHIBITION**

St. Petersburg, Russia
**Staffing at Exhibition**

| Description | | | | ENTER 6-MONTH RUN LOCAL CURRENCY SUBTOTALS |
|---|---|---|---|---|
| One week Training | | | | |
| GM | | | € 450.00 | € 450.00 |
| Assistant GM | 1 | | € 375.00 | € 375.00 |
| Box office supervisor & a | 2 | | € 700.00 | € 700.00 |
| Operations personell | 15 | € 35.00 | € 2,625.00 | € 2,625.00 |
| | | | | **Startup** |
| | | Month | | |
| GM | | | € 900.00 | € 5,400.00 |
| Assistant GM | 1 | | € 750.00 | € 4,500.00 |
| Box office supervisor & a | 2 | | € 1,400.00 | € 8,400.00 |
| accountant | 1 | | € 800.00 | € 4,800.00 |
| Operations personell | 15 | € 35.00 | € 15,750.00 | € 94,500.00 |
| Security nightwatch | shift | € 90.00 | € 2,700.00 | € 16,200.00 |
| | | | | **Operations** |
| **Subtotal Staffing at Exhibition** | | | | **137,950** |

**BODIES - THE EXHIBITION**

St. Petersburg, Russia
**Venue - Construction**

| Description | ENTER 6-MONTH RUN LOCAL CURRENCY SUBTOTALS |
|---|---|
| Placeholder, Box office, retail, admin | € 100,000.00 |
| Grid | € 50,000.00 |
| | **Startup** |
| | **Operations** |
| **Subtotal Venue - Construction** | **150,000** |

**BODIES - THE EXHIBITION**

St. Petersburg, Russia
**Venue - Operations**

| Description | | ENTER 6-MONTH RUN LOCAL CURRENCY SUBTOTALS |
|---|---|---|
| | | **Startup** |
| | Week | |
| Operations weekly expenses misc | € 500.00 | € 13,000.00 |
| Fireman | € 200.00 | € 5,200.00 |
| First Aid | € 200.00 | € 5,200.00 |
| Telephones/Internet | € 300.00 | € 7,800.00 |
| Cleaning | € 200.00 | € 5,200.00 |
| | | **Operations** |
| **Subtotal Venue - Operations** | | **36,400** |

**BODIES - THE EXHIBITION**

St. Petersburg, Russia
**Production Related**

| Description | | ENTER 6-MONTH RUN LOCAL CURRENCY SUBTOTALS |
|---|---|---|
| Venue signage | | € 20,000.00 |
| Translations Audio& Catalog Exhibition scrims | | € 10,000.00 |
| Website | | € 5,000.00 |
| | | **Startup** |
| Ticket Printing | | - |
| supplies | 1,000 | € 26,000.00 |
| | | **Operations** |
| **Subtotal Production Related** | | **61,000** |

**BODIES - THE EXHIBITION**

St. Petersburg, Russia
Other Costs - G&A

| Description | | ENTER 6-MONTH RUN LOCAL CURRENCY SUBTOTALS |
|---|---|---|
| | | **Startup** |
| Credit Cards 60% of sales @ 3% | 77,814 | € 77,814.00 |
| Insurance | | € 20,000.00 |
| | | **Operations** |
| **Subtotal Other Costs - G&A** | | 97,814 |