UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ONE-GO-EVENTS BENELUX BV,                                  **ECF CASE**

                Plaintiff,

- against -                                                07 Civ. 8185 (PKL)

JAM EXHIBITIONS, LLC,

                Defendant.
------------------------------------------------------------------X

## AFFIRMATION OF PAUL KOSTER

      PAUL KOSTER, states and affirms the following pursuant to 28 USC § 1746:

      1.      I am the President of ONE-GO-EVENTS BENELUX BV ("One-Go-Events"), a Netherlands based promotion company with experience in the organization and logistical aspects of publicly accessible events, such as cultural exhibitions. I have personal knowledge of the facts contained herein, unless otherwise stated upon information and belief.

      2.      I make this Affirmation in opposition to defendant JAM EXHIBITIONS, LLC's ("JAM") motion to dismiss and in support of One-Go-Event's cross-motion for leave to amend its Complaint.

      3.      In his Affidavit dated November 25, 2007, Arny Granat, Chairman of JAM, admitted that JAM and One-Go-Events had discussions regarding One-Go-Events presenting and promoting the Bodies Exhibit (later on re-named to "BODIES The Exhibition/"The Human Body") in Saint Petersburg, Russia. (See ¶¶ 1-2 of the Granat Affidavit.)

      4.      However, Mr. Granat further stated that "[t]he discussions between the parties were preliminary only and final agreement was never reached" and that the "parties never

reached a final agreement and, Jam never intended to be bound by the Draft Agreement." (See ¶¶ 2 and 5 of the Granat Affidavit.)

5. As my Affirmation will make clear, Mr. Granat's Affidavit is an inaccurate rendition of the state of affairs between JAM and One-Go-Events.

6. As I understand, JAM is a presenter and promoter of shows, concerts, and other entertainment productions. As part of a joint venture with an affiliate of Concert Production International ("CPI"), JAM contracted with Premier Exhibitions, Inc. ("Premier"), the owner of the license to a human anatomy exhibition known as "Bodies Exhibit," to present Bodies Exhibits throughout various cities internationally and Saint Petersburg in particular.

7. Under JAM's agreement with Premier, JAM was required to pay Premier a $500,000.00 non-refundable fee for the license to, and provision of, the specimens and other materials which comprised the Bodies Exhibit in Saint Petersburg. Additionally, Premier was to receive 50% of the net profits earned from the Bodies Exhibit, up until net exhibition profit was equal to the aggregate of the $500,000.00 license fee and certain other shared costs in launching the exhibition, at which point Premier would receive 70% of the profits.

8. In exchange for its share of the net exhibition profits, JAM was required to make all of the arrangements for the presentation and promotion of the Bodies Exhibit. JAM's practice was to engage a local company as a partner in developing, presenting, and promoting the Bodies Exhibits in a particular region, with the local company sharing in both the expenses as well as JAM's profit split.

9. In May of 2005, I attended a Bodies Exhibit in Atlanta, Georgia and became interested in having One-Go-Events be a part of bringing the Bodies Exhibit to Russia.

My company, One-Go-Events, was later referred to JAM by the former CEO of Mojo Concerts (now a part of Live Nation).

10. On January 9, 2007, Paco Zimmer, President of JAM, contacted me via e-mail to open negotiations regarding the possibility of One-Go-Events assisting JAM in presenting and promoting the Bodies Exhibit in Saint Petersburg, Russia. (A copy of the January 9, 2007, e-mail is annexed as Exhibit A).

11. On January 12, 2007, I responded with a proposal outlining the services which One-Go-Events could offer to JAM. (A copy of the January 12, 2007, e-mail is annexed as Exhibit B).

12. These preliminary discussions continued throughout January and February of 2007, as JAM began to develop its business plan for the venture. This business plan was developed primarily by JAM but with input from myself as to particulars specific to the market environment in Russia. (See e-mail dated February 7, 2007 a copy of which is annexed as Exhibit C).

13. In an e-mail dated March 9, 2007, Mr. Zimmer sent me a final copy of the business plan, and outlined two proposals for how One-Go-Events might proceed with the venture. The first option entailed One-Go-Events paying a $500,000.00 license fee directly to Premier up front (in lieu of JAM having to pay the $500,000.00 license fee itself) and assuming 100% of the setup costs for the Bodies Exhibit. In exchange, One-Go-Events would receive approximately €413,000 of the anticipated profits (after the split with Premier). The second option involved One-Go-Events paying 20% of the guarantee up front (approximately $166,666.66) as well as 20% of the setup costs, and in exchange receiving 20% of the profits

(anticipated to be approximately €248,000) after Premier's share.  (A copy of the March 9, 2007, e-mail and attachments is annexed as Exhibit D).

   14. This was the only copy of the business plan which was ever exchanged and all the steps undertaken to present and promote the Bodies Exhibit in Saint Petersburg were taken based upon this business plan.  Under the business plan the Bodies Exhibit was scheduled to open on May 26, 2007, and to close on October 24, 2007.

   15. On March 25, 2007, Mr. Zimmer advised me that "BODIES The Exhibition is confirmed for St Petersburg, RU, Erasia for May 26 2007 opening through Oct 28 2007."  (See e-mail dated March 25, 2007 a copy of which is annexed as Exhibit E).

   16. On March 30, 2007, I and several other employees of One-Go-Events met with representatives of JAM at the Barbizon Hotel in Amsterdam to finalize negotiations for the Bodies Exhibit in Saint Petersburg and to finalize the marketing plans for the exhibition.  Present at the meeting were myself, representing One-Go-Events, Bruno de Haas (my partner in a Dutch company who was assisting in the project) and his assistant Doeke Tomberg, Tatyana Samokhvalova and Olga Danilova in the Marketing department of One-Go-Events' Russian office, Kirill Tikhonin of the Production department for One-Go-Events' Russian office, Mr. Zimmer, President of JAM, Jon C. Martin, National Director Of Operations for JAM, and Jeff Cornelius Director of National Marketing for JAM.

   17. On March 31, 2007, Mr. Zimmer e-mailed me a draft Co-Promoter Agreement embodying all of the discussions which had taken place up to that point between JAM and One-Go-Events and commenting "[w]e look forward to working with you on this exciting project."  The draft Co-Promoter Agreement provided, among other things, that the Bodies Exhibit would open on May 26, 2007 and would close on October 24 – 28, 2007, and that

- 4 -

One-Go-Events would pay $100,000.00 to JAM for presentment of the Saint Petersburg exhibition (one-fifth of the license fee owed to Premier by JAM), as well as assume one-fifth of all of the operating costs and cash required to start up the Saint Petersburg exhibition. In exchange, One-Go-Events would be entitled to one-fifth of JAM's share of the profits related to the Bodies Exhibit. A number of clauses in the draft Co-Promoter Agreement made reference to a business plan and budget attached as Schedule A. I understood this Schedule A to be the business plan which was provided to me by Mr. Zimmer via e-mail on March 9, 2007. This was the understanding I had during discussions with Mr. Zimmer and other representatives of JAM during our meeting in Amsterdam as well. (A copy of the March 31, 2007, e-mail and attachments is annexed as Exhibit F).

18. Due to the short time frame involved (with the Bodies Exhibit scheduled to open in less than two months), Premier began to work with One-Go-Events directly in respect of technical matters immediately following the Amsterdam meeting. Premier forwarded sample materials, and began discussions with One-Go-Events regarding how the exhibit hall should be decorated and renovated, providing architectural plans and drawings and other instructions. These design and marketing discussions would continue throughout April and May of 2007. (See e-mails dated March 24, 2007, March 30, 2007, April 3, 2007, April 18, 2007, April 20, 2007, May 10, 2007, and May 15, 2007, copies of which are annexed hereto as Exhibit G).

19. Also around this time, One-Go-Events entered negotiations with Ticketpro Montreal, Canada a Canadian ticket agency to handle ticketing for the Bodies Exhibit. JAM was kept apprised regularly of One-Go-Events actions taken in preparation for the opening of the Bodies Exhibit. (See e-mails dated March 15, 2007, and March 31, 2007, copies of which are annexed hereto as Exhibit H).

20. While all of these preparations for the opening of the exhibit were being made, Mr. Zimmer and I worked out the last point with regard to the draft Co-Promoter Agreement. Specifically, Mr. Zimmer, whose lawyers had apparently drafted the draft Co-Promoter Agreement to include a clause providing that all disputes would be resolved by courts in Saint Petersburg, Russia and applying Russian law, nevertheless felt that it would be better to have disputes resolved by The Netherlands courts applying the law of The Netherlands. I consented to this change and the draft Co-Promoter Agreement was modified accordingly. In my mind this newly revised draft of the Co-Promoter Agreement constituted the final agreement between JAM and One-Go-Events. (A copy of the final Co-Promoter Agreement (the "Final Agreement") is annexed hereto as Exhibit I). As with the draft Co-Promoter Agreement, a number of clauses in the Final Agreement made reference to a business plan and budget attached as Schedule A, and again as with the draft Co-Promoter Agreement, I understood this to be an incorporation by reference of the business plan which Mr. Zimmer provided on March 9, 2007.

21. Due to the short time frame during which One-Go-Events, JAM and Premier had to arrange the presenting and promotion of the Bodies Exhibit, the parties did not execute the Final Agreement at this time. However, as I stated above, I felt that the parties were bound by the Final Agreement and every action taken by One-Go-Events from this point forward (early April 2007) was taken in furtherance of, and pursuant to the Final Agreement.

22. I did not find it to be unusual that the Final Agreement was not executed. In fact, it has been my experience that it is customary in this industry for the planning of events such as the Bodies Exhibit that a formal contract will not executed until just shortly before the launching of the event.

23. In any case, Premier, JAM, and One-Go-Events continued to work together to present and market the Bodies Exhibit in Saint Petersburg.

24. On April 12, 2007, Mr. Zimmer notified me that Premier had encountered a delay in providing the specimens for the Bodies Exhibit, and he suggested that we delay the opening of the exhibit by two weeks. (A copy of the April 12, 2007, e-mail is annexed as Exhibit J).

25. I accepted this modification of the schedule and meanwhile One-Go-Events continued to work with Premier regarding preparation of the venue and local marketing materials (such as translating the catalogue for the exhibit *etc.*) These discussions would continue throughout the rest of April 2007, as the deadline for printing these materials was May 16, 2007.

26. Additionally, concerns had been raised regarding whether VAT (value added tax) would need to be paid on the tickets sold in connection with the Bodies Exhibit and various other tax issues. Thus, at the end of March 2007, One-Go-Events engaged Deloitte & Touche CIS as tax consultants to provide advice as to these issues. Ultimately, it was determined that VAT would not be applicable because of the educational nature of the Bodies Exhibit and the other tax issues were similarly resolved.

27. Additionally, around the same time, One-Go-Events took steps to provide insurance to JAM relating to the exhibit.

28. On May 29, 2007, JAM provided further notice to One-Go-Events of delays in obtaining the specimens for the Bodies Exhibit. At this time, JAM stated that the bodies would arrive in Saint Petersburg on June 1, 2007, via shipment from Helsinski, Finland, and would be cleared from customs by June 8, 2007, at the earliest. (A copy of the May 29,

2007, e-mail is annexed as Exhibit K). As a result of these additional delays, the opening of the Bodies Exhibit was re-scheduled to June 16, 2007.

29. On May 22, 2007 and May 23, 2007, representatives of Premier and JAM traveled to Saint Petersburg in advance of the planned opening of the Bodies Exhibit. One-Go-Events assisted Premier and JAM in obtaining the appropriate visas and paid for all of the travel accommodations for the trip.

30. However, shortly before the planned opening of the Bodies Exhibit, the specimens were detained by Russian customs officials and the opening was once again delayed until June 23, 2007 at the earliest. (See e-mail dated June 16, 2007, a copy of which is annexed hereto as Exhibit L). This opening did not occur.

31. On June 28, 2007, Premier informed JAM and One-Go-Events that it had retained a Washington, DC law firm to "lead the charge in Russia" to get the specimens released from customs. (A copy of the June 28, 2007, e-mail is annexed as Exhibit M).

32. During these delays, Mr. Zimmer advised me that JAM would not be paying Premier the $500,000.00 license fee contemplated by their agreement until the Bodies Exhibit had actually opened, and thus, further advised me not to pay Premier the $100,000.00 payment contemplated under the Final Agreement until the exhibit launched, since that represented one-fifth of the license payment owed to Premier by JAM. In reliance upon these instructions, One-Go-Events did not make the $100,000.00 payment to Premier in advance of the opening of the Bodies Exhibit.

33. The Bodies Exhibit never opened as planned. Premier ultimately decided to "abort" its plans for the exhibition and attempt to obtain permission for the specimens to be removed from Russia, rather than fight to keep the specimens in the Country. (See Exhibit M).

34. This is despite the fact that One-Go-Events had fully complied with its obligations under the Final Agreement with respect to presenting and marketing the exhibition. All of the marketing materials had been localized and printed, and the venue had been fully designed and outfitted for the exhibit. (See e-mail dated June 21, 2007, and photographs of the exhibit venue, copies of which are annexed hereto as Exhibit N).

35. On June 18, 2007, I met with Judith Geller, one of the representatives of Premier who was in Saint Petersburg at that time, to discuss the delays. Mrs. Geller advised me that there were big problems with securing permission from the Russian authorities for the importation of the specimens and that the Bodies Exhibit would not be opening. At that point, I made the decision to stop expending any further money and resources in presenting and marketing the Bodies Exhibit.

36. One-Go-Events had paid and was out of pocket the sum of €443,248.25 in connection with the work done for the Bodies Exhibit.

37. Later in June 2007, I met with Mr. Zimmer, who was also in Saint Petersburg, to discuss the settlement of matters between JAM and One-Go-Events. After some negotiation, Mr. Zimmer made an offer to pay €450,000.00 to One-Go-Events. Despite my acceptance of this offer, no payments were ever made by JAM to One-Go-Events.

38. By late July of 2007, Premier, JAM and CPI were in the late stages of negotiation for a settlement regarding the Bodies Exhibit in Saint Petersburg. Mr. Zimmer advised me that JAM could not settle with One-Go-Events until the settlement with Premier and CPI had been finalized, because to pay One-Go-Events now would cause JAM to lose "leverage" against Premier. (See e-mails dated July 19, 2007, and July 24, 2007, copies of which are annexed hereto as Exhibit O).

39. However, Mr. Zimmer continually assured me that One-Go-Events would be paid and reimbursed for its expenses. In fact, Mr. Zimmer advised me "[t]he bottom line is you will be reimbursed. There are no excuses." Despites these assurances, no payments were ever made by JAM to One-Go-Events. (See e-mails dated July 24, 2007, and July 31, 2007, copies of which are annexed hereto as Exhibit P).

40. Thus, it became necessary for One-Go-Events to file this lawsuit. As can be seen from the above, Mr. Granat's statements that "[t]he discussions between the parties were preliminary only and final agreement was never reached" and that the "parties never reached a final agreement and, Jam never intended to be bound by the Draft Agreement," are contrary to what actually occurred between JAM, Premier, and One-Go-Events in preparing for the opening of the Bodies Exhibit in Saint Petersburg.

41. The three companies worked closely together for months to present and market the exhibit, and each company was fully aware of the steps being taken by the others. The amount of funds and other resources expended by all three companies belies Mr. Granat's claim that JAM considered the Final Agreement to be preliminary only or that JAM never intended to be bound by the Final Agreement. Moreover, JAM's repeated settlement offers and assurances that One-Go-Events would be paid for its work, are totally contrary to the idea that JAM considered itself not to be bound by the Final Agreement.

42. Based on the above, I believe that in all fairness JAM's motion to dismiss should be denied.

The foregoing is true and correct to the best of my knowledge under the penalty of perjury under the law of the United States.

Executed on: December 12, 2007

_____
Paul Koster

- 10 -